[Civ. No. 49465. Second Dist., Div. Two. Mar. 18, 1977.]

IMOGENE GREEN, Plaintiff and Respondent, v.
DEPARTMENT OF MOTOR VEHICLES, Defendant and Appellant.

COUNSEL

Evelle J. Younger, Attorney General, and Marilyn K. Mayer, Deputy Attorney General, for Defendant and Appellant.

Goldin & Goldin and Martha Goldin for Plaintiff and Respondent.

OPINION

FLEMING, Acting P. J.—Appellant Department of Motor Vehicles appeals a judgment of the superior court granting respondent a writ of administrative mandate compelling appellant to reinstate respondent's drivers license, which appellant had suspended pursuant to Vehicle Code section 13353, subdivision (b), following respondent's arrest for drunk driving and refusal to submit to a chemical test of intoxication.[1] Respondent prevailed below on the theory that her arrest was invalid; appellant contends here that as a matter of law the evidence shows either a valid citizen's arrest or a police officer arrest based on probable cause.

---

[1]Vehicle Code section 13353 in relevant part provides:

"(a) Any person who drives a motor vehicle upon a highway shall be deemed to have given his consent to a chemical test of his blood, breath or urine for the purpose of determining the alcoholic content of his blood if lawfully arrested for any offense allegedly committed while the person was driving a motor vehicle under the influence of intoxicating liquor. The test shall be incidental to a lawful arrest and administered at the direction of a peace officer having reasonable cause to believe such person was driving a motor vehicle upon a highway while under the influence of intoxicating liquor. Such person shall be told that his failure to submit to or complete such a chemical test will result in the suspension of his privilege to operate a motor vehicle for a period of six months.

"The person arrested shall have the choice of whether the test shall be of his blood, breath or urine, and he shall be advised by the officer that he has such choice. If the person arrested either is incapable, or states that he is incapable, of completing any chosen test, he shall then have the choice of submitting to and completing any of the remaining tests or test, and he shall be advised by the officer that he has such choice.

"Such person shall also be advised by the officer that he does not have the right to have an attorney present before stating whether he will submit to a test, before deciding which test to take, or during administration of the test chosen.

". . . . . . . . . . . .

"(b) If any such person refuses the officer's request to submit to, or fails to complete, a chemical test, the department, upon receipt of the officer's sworn statement that he had reasonable cause to believe such person had been driving a motor vehicle upon a highway while under the influence of intoxicating liquor and that the person had refused to submit to, or failed to complete, the test after being requested by the officer, shall suspend his privilege to operate a motor vehicle for a period of six months. No such suspension shall become effective until 10 days after the giving of written notice thereof, as provided for in subdivision (c)."

The facts are not in dispute and show the following: a private citizen, Mr. Michael Baughn, while driving on the public streets of the city of Covina a little before 1 a.m., observed a person who later turned out to be respondent driving her car in an unlawful and erratic manner. Her car wandered over the painted lines demarcating lanes on the street, went through a red light, made several turns that were overemphasized and on the wrong side of the street, drove back and forth across the double yellow line, and at one point hit a center divider and then straddled the divider for about 10 feet, and also turned around and drove in the wrong direction, northbound in the southbound lane for a few minutes. Baughn observed that the driver of the vehicle was a person with greyish neck-length hair and a yellow top. Baughn continued to follow the car because he thought the driver might kill somebody; eventually he observed respondent pull into a private driveway, stop, and shut off the motor and lights. She remained in the vehicle. At that point Baughn did not know her sex. He went in search of a police officer in order to have the driver arrested. In about 10 minutes he located an officer, Officer Tintle, and told him what he had seen, including a description of the vehicle (a red Lincoln Continental with tan top) and its license plate number. Officer Tintle radioed this information to Officers Olson and McKee of the Covina Police Department, who were assigned to the Alcohol Safety Action Project Team at that time, and advised them that a citizen had flagged him down and told him that he had followed a driver who appeared to be under the influence of alcohol or drugs, and gave the officers the address where Baughn had seen the vehicle stop, which was 1334 East Dexter in the City of Covina, and the description of the vehicle. Officer Tintle further stated that the citizen had stated the subject was still in the vehicle and appeared to be either asleep or unconscious when the citizen left the premises. The officers proceeded to the 1334 Dexter address and there observed the Lincoln Continental described by Baughn, in which respondent, with greyish hair and a yellow top as stated by Baughn, was seated in the driver's seat either asleep or passed out. Officers Olson and McKee had to shake respondent to awaken her, and then requested that she exit the vehicle, which she did. She then exhibited obvious symptoms of intoxication such as red and glassy eyes, thick and slurred speech, and a strong odor of alcohol upon her breath. She was unsteady on her feet and had to be supported by Officer Olson to keep her upright. Respondent asked the officers what they were doing there and indicated that this was her home and she wished to go inside the house. The officers advised her that she had been observed driving on the streets while intoxicated and, believing that they lacked the statutory power to arrest for drunk driving which they had not

personally observed, radioed Officer Tintle to bring Mr. Baughn to the location to effectuate the arrest. Accordingly the officer picked Mr. Baughn up at his home and escorted him to the scene of the detention. The officers there told him that they did not have the power to arrest respondent and the only way she could be arrested was if Baughn were to make a citizen's arrest. They also asked Mr. Baughn if this were the person he had observed previously. Baughn stated that the hair color and length and the yellow top were as he had observed, and that although at first he had thought the driver might be a man, he now observed that she was a woman with "rough mannish features." After the police told Mr. Baughn that they had located respondent in the driver's seat of the vehicle, then Mr. Baughn stated that he was sure she was the driver he had observed, and he further stated that he wanted to have her arrested. The police then attempted to administer a field sobriety examination to respondent, but she refused to cooperate. Mr. Baughn stated he thought she was drunk; she was continually staggering and swaying from side to side, and reeked of alcohol. Accordingly Officer McKee instructed Baughn as to the procedure for a citizen's arrest: that he should advise her that in his opinion she was under the influence of alcohol and that he was placing her under a citizen's arrest for drunk driving, which Baughn did. Officer McKee then told her she was being arrested for a violation of Vehicle Code section 23102, subdivision (a).[2] The officers told respondent that she was subject to loss of her license for six months for refusal to take the sobriety test (implied consent admonition, Veh. Code § 13353, *supra*, fn. 1) and took her into custody. When the officers completed the arrest, respondent did not appear to be in a condition to take care of herself, and eventually Officer Tintle had to assist Officer Olson in holding her; accordingly Officer Tintle expressed the opinion that she was then subject to arrest for violating Penal Code section 647, subdivision (f) (intoxication in a public place in such a condition that the suspect is unable to exercise care for his own safety or that of others).

█  Respondent's position, which presumably is the basis for the judgment in her favor below, is that if the arrest was effectuated by the police officers it is invalid under Penal Code section 836, subdivision 1, which provides that a warrantless arrest for an offense other than a felony must be based on reasonable cause to believe that the arrestee has committed the offense in the officers' presence, but here none of the officers witnessed the offense of driving while intoxicated upon the

---

[2]Vehicle Code section 23102, subdivision (a) provides: "(a) It is unlawful for any person who is under the influence of intoxicating liquor, or under the combined influence of intoxicating liquor and any drug, to drive a vehicle upon any highway."

public streets. Alternatively, if the arrest be viewed as a private citizen's arrest (Pen. Code, § 837), it is invalid according to *Jackson v. Superior Court* (1950) 98 Cal.App.2d 183 [219 P.2d 879], because of the so-called fresh pursuit rule that a warrantless arrest must be effected in fresh pursuit of the offender or within a reasonable time after the offense is committed; and further, the arrest is invalid because Baughn had no actual knowledge that respondent was intoxicated.

Respondent was arrested within 35 to 40 minutes of the time that Baughn observed her enter her driveway. Baughn had actual knowledge that she had committed multiple public offenses in his presence, possibly including that of reckless driving. Very wisely, he chose to enlist the aid of the police in effectuating the arrest rather than risking his own safety, and he did secure the aid of a police officer as promptly as possible. What is more, at the detention scene Baughn acquired actual knowledge that respondent was intoxicated, giving him the right to arrest for driving under the influence. All of the requirements set forth in *Jackson* and like cases were more than followed here by the private citizen who took considerable time and trouble to aid in protecting the innocent public from respondent's reckless conduct. It would appear ludicrous to hold that appellant cannot protect the motoring public by suspending respondent's license based on the uncontradicted facts set forth above, because Baughn was afraid to drag respondent out of her car and arrest her unassisted. This is not a case where the citizen observing the offense went about his other business and then later decided to effectuate an arrest.[3] Rather, Baughn thought he had done all he need do after he related the circumstances of the affair to Officer Tintle. When he was shortly thereafter recalled to the scene because technicalities prevented the officers from making the arrest, he came at once and effected the arrest personally with the aid of the police. His conduct was wholly lawful. Common sense and the case law both agree that the private citizen effecting an arrest may summon the police to his aid. *People v. Campbell* (1972) 27 Cal.App.3d 849, 854 [104 Cal.Rptr. 118]; *People v. Sjosten* (1968) 262 Cal.App.2d 539, 544 [68 Cal.Rptr. 832]; *Freeman v. Dept. Motor Vehicles* (1969) 70 Cal.2d 235, 238 [74 Cal.Rptr. 259, 449 P.2d 195]. There is no requirement that the citizen keep the offender within view throughout the time intervening between observation of the offense and arrest. (See e.g., *People v. Sjosten* (1968) 262 Cal.App.2d 539 [68 Cal.Rptr. 832].)

---

[3] In *Jackson* the police waited 28 hours before deciding to arrest a child for shooting a beebee gun at a light bulb. (98 Cal.App.2d at p. 185.)

■  It is possible that the trial court's judgment is based on the theory that because the police officers asked respondent to get out of the car and attempted to administer the field sobriety tests to her before Baughn uttered the magic words of arrest, the police conduct was viewed as not incidental to a valid arrest at that time and hence not authorized under Vehicle Code section 13353, *supra*. Such a theory, however, is erroneous. First, as stated, the police were acting as agents assisting in effectuating Baughn's citizen's arrest, a procedure authorized by the cases cited, *supra*. The entire sequence of events beginning when Baughn decided to arrest respondent and went to get help constitutes the arrest, see *People v. Harris* (1967) 256 Cal.App.2d 455, 459-460 [63 Cal.Rptr. 849]; *Freeman* v. *Dept. Motor Vehicles, supra,* 70 Cal.2d at page 237. Second, even if the court believed that the arrest had not been initiated when McKee and Olson first detained respondent, there is no element of illegality in the police activity described because there was ample probable cause to detain respondent. It is well recognized that in California an officer may stop a motorist or pedestrian for questioning under circumstances short of probable cause to arrest, *Cornforth* v. *Department of Motor Vehicles* (1970) 3 Cal.App.3d 550, 552 [83 Cal.Rptr. 762]; *People v. Mickelson* (1963) 59 Cal.2d 448, 450 [30 Cal.Rptr. 18, 380 P.2d 658], where the circumstances would have indicated to a reasonable man in like position that an investigation was necessary to a proper discharge of the officer's duties, *People v. Perez* (1966) 243 Cal.App.2d 528, 531 [52 Cal.Rptr. 514]. Furnished with Baughn's description of respondent's driving and finding her in the location stated by Baughn and in the car described by him, the officers would have been derelict in their duty had they not investigated respondent's condition, for her own protection as well as to protect the motoring public.

Because there is no conflict in the evidence on the question of the legality of the arrest, the conclusion to be drawn as to its validity is one of law. *Cornforth, supra,* 3 Cal.App.3d at page 553. The judgment is reversed, with direction to enter judgment denying issuance of a writ of mandate.

Compton, J., and Beach, J., concurred.

A petition for a rehearing was denied April 14, 1977, and respondent's petition for a hearing by the Supreme Court was denied May 12, 1977.